# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 24, 2010

Lyle W. Cayce
Clerk

No. 09-40989

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

PAUL EDWARD THOMAS; DERRICK VAN HODGES,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before CLEMENT, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK:

Half-brothers Paul Edward Thomas and Derrick Van Hodges were convicted of numerous counts of conspiracy, bank robbery, and weapons possession. Both challenge the sufficiency of the evidence, the district court's decision to try them jointly, and one part of the computation of their sentences. Thomas alone argues that several search warrants were invalid, while Hodges argues the existence of juror bias and that his sentence constitutes cruel and unusual punishment. We AFFIRM.

## STATEMENT OF FACTS

Between 2005 and 2007, two men committed a series of armed bank robberies across eastern Texas. The bank robberies were executed in the same general manner. Two men arrived at each bank wearing clothing that covered

No. 09-40989

their skin, hair, and faces; the robbers brandished weapons and ordered customers to lie on the floor; the shorter man jumped over the counter and collected money from the cash drawers; the taller man stood guard in the lobby; and the pair escaped in a recently-stolen vehicle, which they later abandoned for another vehicle. Each robbery was completed within two minutes.

On September 27, 2007, Derrick Van Hodges was arrested in Tyler, Texas on a state warrant. The basis for the warrant was DNA evidence linking Hodges to a glove dropped during a bank robbery in Henderson, Texas. When arrested, Hodges had in his possession a $10 bait bill taken a week earlier during the robbery of a bank in Crockett, Texas. Four more bait bills were found during a subsequent search of storage units rented by Paul Edward Thomas and Thomas's mother (who is also Derrick Van Hodges' mother). A sixth bait bill was found in a child's bedroom at Thomas's residence.

Thomas and Hodges were named in an 18-count indictment charging them with conspiracy, bank robbery, and weapons offenses related to the following bank robberies:

1. December 5, 2005 - Kelly Tyler Federal Credit Union, Tyler, Texas;

2. November 3, 2006 - Bank of America, Henderson, Texas;

3. June 22, 2007 - Austin Bank, Troup, Texas;

4. July 6, 2007 - Bank of America, Lufkin, Texas; and

5. September 21, 2007 - Citizen's National Bank, Crockett, Texas.

Thomas and Hodges were jointly tried before a jury and convicted on each count. Thomas received a sentence of 1,392 months and Hodges received a sentence of 1,435 months. Each filed a timely notice of appeal.

No. 09-40989

DISCUSSION

I.    *Sufficiency of the Evidence*

Thomas and Hodges argue the government presented insufficient evidence identifying them as the bank robbers.

Thomas argues that no witness, DNA sample, weapon, or other piece of evidence put him "at the scene of any of the banks."   He contends the government's case rests upon a pair of shoes, a .380 cartridge, a hat, and four bait bills.  Thomas claims the evidence against Hodges was much stronger and implies that Thomas was found guilty by association.

Hodges presents similar arguments, challenging the lack of eyewitness identification; weapons and ammunition "so common as to appear anywhere in the country"; and DNA testing that was "weak in some instances."  He argues that his repeated DNA matches were "happenstance" because he "was in the business of selling old clothes."  He contends the bait bill found in his wallet one week after a bank robbery was also "happenstance."

Both defendants preserved the challenge to sufficiency by moving for judgment of acquittal at the close of the government's case-in-chief and at the end of trial.  *See United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008).

We review the denial of a motion for judgment of acquittal *de novo*.  *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007). "[W]e view the evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt."  *Id*. (citation omitted).  Jurors are "free to choose among reasonable constructions of the evidence" in order to arrive at a verdict. *Id*. (citation omitted).   We apply this standard of review to direct and circumstantial evidence.  *Id*.  "We do not evaluate the weight of the evidence or the credibility of the witnesses."  *United States v. Solis*, 299 F.3d 420, 445 (5th Cir. 2002) (citation omitted).

3

No. 09-40989

A.     *Evidence as to each offense*

We will discuss later the evidence that demonstrated the robberies were conducted similarly. We begin by summarizing the specific evidence introduced for each bank, then subdividing further to show the specific evidence, if any, against each defendant.

1.     *Kelly Federal Credit Union – Tyler, Texas*

After the robbery of the Kelly Federal Credit Union outside of Tyler, police found the abandoned getaway vehicle approximately two and a half miles from the credit union. Its motor was still running. Inside the vehicle were a pair of tennis shoes and one live round of .380 caliber ammunition. On the ground outside the vehicle was a t-shirt. The vehicle had a damaged steering column indicating that it had been operated without its key. Its owner confirmed that it had recently been stolen from a fenced lot four miles from the credit union.

a.     *Evidence as to Thomas*

Those who stole the getaway vehicle gained access to the lot in which it was stored by cutting a padlock on a gate. The vehicle owner testified that he thought the padlock was sturdy and would have to have been cut using "some very large bolt cutters." Several pairs of bolt cutters were found in Thomas's storage units. In addition, the .380 cartridge found in the vehicle was made by the same manufacturer as .380 cartridges later found in Thomas's storage units. The government presented evidence that the rounds were manufactured in the same batch of 100,000 cartridges.

Nuclear DNA analysis was performed on the tennis shoes found inside the getaway vehicle. Thomas could not be excluded as a contributor to the DNA on the tennis shoes.[1] The probability that the DNA came from an African-American other than Thomas was 1 in 1,274 (left shoe) and 1 in 883 (right shoe).

---

[1] Most of the items analyzed contained several DNA profiles. When we note that one of the defendants could not be excluded, that means the other defendant was excluded.

No. 09-40989

### b.    *Evidence as to Hodges*

Nuclear DNA analysis was performed on the t-shirt found outside the getaway vehicle. Hodges could not be excluded as a contributor. The probability that the DNA on the t-shirt came from an African-American other than Hodges was 1 in 966.2 million.

### 2.    *Bank of America – Henderson, Texas*

Bank security photos showed that the robbers brandished what appeared to be an assault rifle with a distinctive banana clip and a small caliber pistol. Upon their exit, the robbers fired two shots into the bank parking lot. The police recovered one empty cartridge casing from the bank parking lot.

The robbers then drove less than a quarter-mile and abandoned the getaway vehicle in a grocery store parking lot. The getaway vehicle was found with its engine running and a damaged steering column. Police learned it had recently been stolen from a church five miles west of Henderson. Inside the getaway vehicle was a second empty cartridge casing. It matched the empty casing found in the bank parking lot.

An eyewitness testified that on the morning of this robbery, he saw in the grocery store lot a black man wearing a cap run in front of the getaway vehicle and into the woods, then return and get into a white four-door older-model car. The white car was then driven west.

Another eyewitness, who had heard about a bank robbery in progress over a police scanner, stepped outside of his office to observe traffic. He saw a white four-door sedan run a stop sign and then almost hit another vehicle. A black man wearing a light-colored skull cap was driving and had a black passenger. The car was headed west. That eyewitness's office security camera captured an image of the car; a still photo from that camera was introduced into evidence.

### a.    *Evidence as to Thomas*

No. 09-40989

Several months after this robbery, a gun case containing an assault rifle, a banana clip, a .25 caliber pistol, and ammunition was discovered in the woods approximately 40 miles from Henderson, Texas.  The government suggested these could be the same weapons used in the bank robbery because: (1) another witness testified that the gun case "looked like" and "appeared to be" the gun case stolen from his storage unit in Tyler, Texas, and (2) other items stolen from this same witness were later discovered in Thomas's storage units.  A firearms expert from the FBI confirmed that the recovered assault rifle and handgun looked similar to those used in the bank robbery but could not determine conclusively that they were the actual weapons used.

The driver of the fleeing vehicle wore a light-colored skull cap.  The government introduced a picture of Thomas wearing a white skull cap, and introduced skull caps seized in Thomas's storage units.

### b.      Evidence as to Hodges

Police discovered a cotton glove in the woods by the grocery store parking lot.  Nuclear DNA analysis could not exclude Hodges as a contributor to the DNA on the glove.  The probability that the DNA came from an African-American other than Hodges was 1 in 228.7 billion.

The government introduced a photograph of Hodges' wife's vehicle parked in front of Hodges' home.  It was allegedly "very similar" to the vehicle fleeing the bank robbery as captured by the security camera.  The jury was invited to compare the photos for a potential connection to Hodges.

### 3.      Austin Bank – Troup, Texas

The robbers fled this bank robbery in a stolen Chevrolet Blazer, which was found running and displayed damage to the steering column.  Police found a black hat inside the Blazer.

### a.      Evidence as to Thomas and / or Hodges

6

No. 09-40989

The day after the bank robbery, a state trooper stopped Hodges for speeding. Hodges was driving a rented Dodge; his only passenger was Thomas. The trooper noticed both men had large rolls of cash on them, and both gave vague explanations about heading to Houston to see family. After the Dodge was returned to the rental company, law enforcement removed the tires and compared the treads to prints left in the mud next to the abandoned Blazer. The treads matched the prints. These were not rare tires, however, and there was no proof that those specific tires left the prints.

A hair found inside the hat was analyzed using mitochondrial DNA testing. Thomas could not be excluded as the source. The probability that the hair came from an African-American other than Thomas was 1 in 385. An FBI forensic examiner testified that 1 in 385 was the most significant match available for the African-American population, given the FBI's database.

Thomas and Hodges, though, have the same mother and therefore have identical mitochondrial DNA. This evidence thus cannot link a particular defendant to this getaway vehicle. The jury was fully informed of Thomas and Hodges' relationship and this feature of mitochondrial DNA. Thomas argued that he could not have provided the hair in question because he is bald; therefore, he alleged, this evidence properly implicated only Hodges.

Separately, in its discussion of this robbery during closing arguments, the government reminded the jury that Hodges is missing a finger on his left hand, then exhorted the jury to "[l]ook at these photographs and compare for yourself."

### 4.   *Bank of America – Lufkin, Texas*

In this robbery, there was evidence that at least three vehicles were broken into and had their steering columns damaged. At a used car lot four to five miles from the bank, someone cut the chain to the lot, broke into a car, but did not take the vehicle. At the same lot, a pickup truck was broken into and stolen. The pickup truck was used to travel to and from the bank. It was then

No. 09-40989

abandoned, and a van was used by the fleeing robbers. The van had been stolen from a church parking lot approximately three miles from the bank.

### a.    Evidence as to Thomas

No DNA or physical evidence linked Thomas to this bank robbery. During closing arguments, the government highlighted that this robbery required the car thief or thieves to cut the chain into the car lot, implying a need for bolt cutters. Several pairs of bolt cutters were found in Thomas's storage units.

### b.    Evidence as to Hodges

Police found a cloth head-covering, commonly called a do-rag, inside the abandoned van. Hodges could not be excluded as a contributor to the DNA on the do-rag. The probability that the DNA came from an African-American other than Hodges was 1 in 6.579 sextillion (21 zeros after the integer).

### 5.    Citizens National Bank – Crockett, Texas

In preparation for this robbery, the bank robbers stole their getaway vehicle from a car lot approximately 30 to 35 miles south of Crockett. As with the previous robbery, they accessed the car lot by cutting the chain link and then broke into multiple vehicles in an attempt to find an operable vehicle. The getaway vehicle was found approximately a half-mile from the bank, with damage to the steering column.

### a.    Evidence as to Thomas

The bank had mixed a number of $10 bait bills into the money taken during this robbery. Four of these bait bills were discovered during the search of Thomas's storage units. A fifth bait bill was found in a child's room during a search of Thomas's house.

### b.    Evidence as to Hodges

Hodges had one of the bait bills in his wallet when he was arrested approximately one week after this robbery.

### B.    Analysis of the evidence

8

No. 09-40989

The strength of the evidence against each defendant varies from offense to offense. The DNA evidence and bait bills constitute sufficient evidence against Thomas to sustain convictions relating to the first and fifth bank robberies, and sufficient evidence against Hodges to sustain convictions relating to the first, second, fourth, and fifth bank robberies. We also find sufficient evidence to sustain Thomas and Hodges' convictions for conspiracy.

Thomas's complaints about the nuclear DNA evidence are unpersuasive. The fact that the probabilities implicating Thomas are less overwhelming than those implicating Hodges – e.g., one out of several hundred or one thousand, rather than one in one sextillion – does not mean they are statistically insignificant or somehow unreliable. Thomas has not presented any evidence that the DNA results are not statistically significant.

We now consider whether the government presented sufficient evidence to sustain Thomas's convictions relating to the second, third, and fourth robberies, and Hodges' convictions relating to the third robbery.

Without overwhelming direct evidence on these counts, the jury must have considered the circumstantial evidence against Thomas and Hodges, then drawn an inference that they were the bank robbers in each robbery. "Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime – that is, an 'ultimate' or 'elemental' fact – from the existence of one or more 'evidentiary' or 'basic' facts." *County Court of Ulster Cnty., N.Y., v. Allen*, 442 U.S. 140, 156 (1979). In this case, the element requiring inferences to be drawn is identification.

On appeal, "[a]ll reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992) (citation omitted). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially

when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Id.* (internal quotation marks and citation omitted).

Inferences can also be drawn from pattern evidence. Where "the government presents circumstantial evidence of an ongoing pattern of similar transactions, the jury may reasonably infer from the pattern itself that evidence otherwise susceptible of innocent interpretation is plausibly explained only as part of the pattern." *United States v. Kington*, 875 F.2d 1091, 1100 (5th Cir. 1989). In light of "the pattern of dealing suggested by the government's evidence," a jury may reasonably conclude that "the only plausible explanation of the evidence was the government's theory." *Id.* at 1106.

In the present case, the government presented a substantial amount of evidence that the bank robberies were executed in the same manner: a getaway vehicle was stolen in a particular way; there were always two robbers; clothing covered the robbers' exposed skin; weapons were brandished; the shorter man jumped the teller counter; the robbers were in and out within two minutes; and the still-running getaway vehicle was soon abandoned for another vehicle.

For each robbery, the government introduced into evidence security photos and videos, which in banks are sometimes a collection of still photos. The photo and video evidence allowed the jury to consider whether the bank robbers looked and acted similarly in each robbery. This evidence also enabled the jury to determine whether the execution of each bank robbery was so identical as to permit an inference that the bank robbers in each were the same. This evidence may have permitted the jury to identify a bank robber who was missing a finger.

The government introduced other evidence implicating Thomas. Included were items seized from Thomas's storage units, such as bank bags, clothing similar to that worn by the bank robbers, a police scanner, a newspaper clipping about the bank robberies, large bolt cutters, and other tools useful for stealing getaway vehicles. The government also called the property manager of Thomas's

No. 09-40989

storage units to testify. She said Thomas's monthly rent payments were unusual: he always paid with $100 bills.

After the close of evidence, the jury was instructed on drawing inferences from the evidence. The instruction is not challenged.

> [W]hile you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

> In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make, and you should not be concerned about whether the evidence is direct or circumstantial.

> Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact.

> The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

The jury was also instructed to consider separately the evidence for each count and each defendant:

> A separate crime is charged against both Defendants in each count of the superseding indictment. Each count and the evidence pertaining to it should be considered separately. The case of each Defendant should be considered separately and individually.

> The fact you may find one or more of the accused guilty or not guilty of any crimes charged should not control your verdict as to any other crime or any other Defendant. Now, you must give separate consideration to the evidence as to each Defendant.

These instructions informed jurors that they could not, for example, punish Thomas for a robbery for which the government presented inadequate

11

evidence. We presume that the jury followed these instructions. *See United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995).

While separate consideration of any one piece of circumstantial evidence – such as bolt cutters found in one of Thomas's storage units – would not be incriminating alone, the circumstantial evidence must be viewed in light of the pattern evidence. Jurors "may reasonably infer from the pattern itself that evidence otherwise susceptible of innocent interpretation is plausibly explained only as part of the pattern." *Kington*, 875 F.2d at 1100. In the present case, a reasonable inference from the evidence is that Thomas and Hodges committed all five bank robberies.

The government's evidence is weakest as to Thomas's convictions relating to the fourth bank robbery. His co-conspirator, Hodges, is tied to that robbery by DNA evidence, and the probability that the DNA sample from that robbery came from an African-American other than Hodges was 1 in 6.579 sextillion. The jury could reasonably infer that Hodges had the same partner in the first, second, third, and fifth bank robberies, and that he did not acquire a new partner for the fourth robbery who behaved identically to Thomas.

Viewing all the evidence in the light most favorable to the verdict, we conclude that "a rational jury could have found the defendant[s] guilty beyond a reasonable doubt." *Clayton*, 506 F.3d at 412.

## II.    District Court's Denial of a Severance

Before trial, Thomas filed a motion for relief from prejudicial joinder and Hodges filed a motion for severance. Neither claimed they had been improperly joined but rather that they would be unduly prejudiced if tried together. Their motions were denied. Hodges re-urged his motion after Thomas's closing argument, seeking a mistrial. It was denied.

Thomas now argues the jury could not distinguish the defendants because several witnesses referred to Derrick Hodges as "Derrick Thomas" and one

officer initially identified Hodges in the courtroom by pointing to Thomas, before correcting himself. Thomas contends the evidence against him was so weak that the blurring of his identity with Hodges' resulted in Thomas being found guilty by association. Thomas claims he would not have been convicted in a separate trial where there would not have been confusion or evidence spillover.

Hodges complains that Thomas's attorney attempted to save his client by highlighting in closing argument that strong DNA evidence linked Hodges, not Thomas, to the robberies. Hodges claims that pointing out another defendant's culpability was a mutually antagonistic defense and wrongfully permitted Thomas's attorney to become a second prosecutor. Like Thomas, Hodges also argues that confusion in identifying the defendants requires reversal.

It is the rule, not the exception, "that persons indicted together should be tried together, especially in conspiracy cases." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993). Still, if a joint trial would prejudice a defendant, district courts may sever the defendants' trials. Fed. R. Crim. P. 14(a).

The denial of motions for a severance and a mistrial are reviewed for an abuse of discretion. *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007). "[J]oint defendants face a heavy burden in demonstrating to a district court that antagonistic defenses warrant granting a severance motion. The burden is correspondingly heavier when, on appeal, they seek to demonstrate that the district court abused its discretion by declining to do so." *United States v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002).

To demonstrate an abuse of discretion, "the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection." *Mitchell*, 484 F.3d at 775 (internal quotation marks and citation omitted). A defendant is entitled to a reversal on this issue only if he identifies specific events during trial and demonstrates that these events caused

him substantial prejudice. *United States v. Lewis*, 476 F.3d 369, 384 (5th Cir. 2007).

Even when there is some risk of prejudice, limiting instructions will generally prevent actual harm to a defendant:

> Even if there were some risk of prejudice here, the district court gave the very limiting instructions that the Supreme Court has approved as usually sufficient to cure this character of prejudice: (1) that the jury must consider the evidence separately and independently for each defendant and each charge; (2) that the government's burden was to prove each defendant's guilt beyond a reasonable doubt; (3) that no inferences must be drawn from a defendant's exercise of the right to silence; and (4) that statements by the lawyers, including opening and closing arguments, are not evidence.

*Daniels*, 281 F.3d at 178. These limiting instructions were given in this case.

We conclude there was no abuse of discretion in the denial of these motions. The identification confusion argued by Thomas and Hodges did not amount to substantial prejudice or result in an unfair trial. Mostly, the few instances of confusion consist of Hodges' being referred to occasionally as "Derrick Thomas." This is in part explained by the fact that Hodges was also known as "Derrick Thomas." This fact was explained to the jury. Any remaining errors of identification were clarified contemporaneously.

Thomas argues that the evidence against him was weaker than the evidence against Hodges, but "the jury might have attributed greater knowledge to him of his brother's actions than in fact was the case, simply because they were brothers." *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977). This argument is implicitly premised on a codefendant's right to maximize his opportunity for acquittal. There is no such right, though. "A defendant cannot claim prejudice from failure to sever merely because his likelihood of acquittal is not as great in a joint trial as in a separate trial." *Id.* (internal quotation marks and citation omitted).

No. 09-40989

Hodges also argues that a mistrial should have been declared as a result of statements Thomas's attorney made in closing argument. Thomas's attorney sought to convince jurors of the weakness of the evidence against his client by highlighting the more substantial evidence against Hodges:

> Now, the other thing that's significant about this, what type of hair was it that was tested that [the government] claimed came back to Paul Thomas? . . . A head hair. Paul Thomas is bald as a cue ball and he always has been. Now, you tell me of the two identical DNA matches, whose hair fragment was on here? Derrick Hodges. The -- that's what the DNA evidence shows.

Hodges did not immediately object. He moved for a mistrial at the end of Thomas's closing argument, complaining that Thomas's counsel had several times "pointed at our client on every item of DNA evidence."

A defendant who fails to object immediately to part of a counsel's argument and instead waits until the argument has concluded fails to preserve the issue for appeal. *United States v. Soto*, 591 F.2d 1091, 1101 (5th Cir. 1979). We conclude that Hodges' delay in making this objection makes our review only for plain error. *Id.*

This argument of Thomas's counsel lent credence to the government's DNA evidence against Hodges. On the other hand, argument of counsel is not evidence and is not to be considered as such by the jury. *United States v. Mota*, 598 F.2d 995, 1000 (5th Cir. 1979). In the present case, the judge instructed the jury "that any statements, objections or arguments made by the lawyers are not evidence." Such instructions generally cure any prejudice from counsel's statements. *See, e.g.*, *Soto*, 591 F.2d at 1101.

There are other reasons that convince us there was no plain error. First, the joint trial complied with the principle "that persons indicted together should be tried together, especially in conspiracy cases." *Pofahl*, 990 F.2d at 1483. Second, "Rule 14 leaves the determination of risk of prejudice and any remedy

15

that may be necessary to the sound discretion of the district courts." *Zafiro v. United States*, 506 U.S. 534, 541 (1993).   Third, the trial court was entitled to consider not only the prejudice to Hodges, but also "the government's interest in judicial economy and . . . the ways in which it can lessen the prejudice by other means." *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978).   Fourth, the trial court gave multiple appropriate limiting instructions to the jury that cured any prejudice.  *See United States v. Matthews*, 178 F.3d 295, 299 (5th Cir. 1999).   Fifth, even if Hodges were correct that Thomas presented a mutually antagonistic defense,  such defenses are not per se prejudicial.  *Zafiro*, 506 U.S. at 538.

For these reasons, the district court did not abuse its discretion in denying severance and a mistrial.

III.    *Challenge to* Deal v. United States

Both defendants argue that their second or subsequent weapons convictions under 18 U.S.C. § 924(c)(1)(C)(i) should not have been stacked to create sentences totaling over 100 years each.   Thomas states that second or subsequent weapons convictions "should not be applied to multiple findings of guilt under a single indictment charging an ongoing series of offenses."   They acknowledge the Supreme Court has rejected their argument.  *Deal v. United States*, 508 U.S. 129 (1993).  We therefore reject it as well.

Hodges objected at sentencing and preserved his claim on appeal in order to seek reversal of *Deal* in the Supreme Court.  Thomas's preservation of the issue is less clear.  At sentencing, Thomas's counsel stated, "Your Honor, given the state of the current existing law with regard to stacked sentences, we have no objection to that calculation."  We do not decide whether his challenge to *Deal* is properly preserved and simply note counsel's statement.

IV.    *Thomas – Denial of a* Franks *Hearing*

No. 09-40989

Thomas argues the district court should have held an evidentiary hearing to investigate errors in the government's affidavits underpinning several search warrants. *See Franks v. Delaware*, 438 U.S. 154 (1978). Thomas moved to suppress the evidence obtained from these warrants. Hodges also moved to suppress but did not appeal on the issue.

At trial, the government did not specifically contest each alleged inaccuracy but instead argued that Thomas and Hodges had not met their burden to require an evidentiary hearing or suppression of the evidence. On appeal, the government acknowledges one error in an affidavit and argues that the remaining statements challenged by Thomas are peripheral, speculative, or not erroneous.

The district court denied Thomas's motion without an evidentiary hearing, finding that Thomas had "not provided any evidence" that the government's statements were deliberately false or made with reckless disregard for the truth. The court added that even if Thomas had made such a showing, the redacted affidavits would have established probable cause. *See United States v. Sibley*, 448 F.3d 754, 757-59 (5th Cir. 2006).

We review for clear error the district court's finding that an affiant's statements were not deliberately false or not made with reckless disregard for the truth. *United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008). We review *de novo* the district court's conclusions of law, which include the decision to deny an evidentiary hearing under *Franks*. *Sibley*, 448 F.3d at 757; *United States v. Brown*, 298 F.3d 392, 396 (5th Cir. 2002).

To succeed, Thomas needed to make a "substantial preliminary showing" that the affiants' statements were deliberately false or made with reckless disregard for the truth. *Sibley*, 448 F.3d at 758. The district court did not clearly err in finding that Thomas did not make the required showing.

17

No. 09-40989

Our analysis of this issue could end here. In a previous decision, though, we wrote that where the district court continues its analysis to consider whether a search warrant would establish probable cause once the false information was redacted, we "would be prudent" to review this conclusion. *United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002).

"A probable cause determination is a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 710 (internal quotation marks and citation omitted). We evaluate probable cause by the totality of the circumstances. *United States v. Cherry*, 50 F.3d 338, 341 (5th Cir. 1995) (citation omitted).

Here, after the challenged information is excised, the affidavits reveal physical evidence connecting Hodges to at least two of the robberies; Thomas and Hodges matched the general descriptions of the bank robbers; and police had long suspected their involvement in the robberies based on several suspicious encounters with the half-brothers. We agree with the district court that even after redacting the challenged information, the affidavits established probable cause.

## V.    *Hodges – Cruel and Unusual Punishment*

Hodges argues that his 1,435-month sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Specifically, he acknowledges that his 151-month sentence for conspiracy and bank robbery convictions was "fair," but takes issue with his 1,284-month sentence for the weapons convictions. Hodges claims that this "life sentence without the possibility of parole or early release" is unduly harsh and disproportionate to recent bank robbery cases in this circuit. He points out that no one was physically harmed in the bank robberies.

18

No. 09-40989

The Eighth Amendment "has been read to preclude a sentence that is greatly disproportionate to the offense, because such sentences are 'cruel and unusual.'" *McGruder v. Puckett*, 954 F.2d 313, 315 (5th Cir. 1992) (citation omitted). On review, however, this court does not "substitute its judgment for that of the legislature nor of the sentencing court as to the appropriateness of a particular sentence; it should decide only if the sentence is within the constitutional limitations." *United States v. Harris*, 566 F.3d 422, 436 (5th Cir. 2009) (internal quotation marks and citation omitted). Thus, "our review of Eighth Amendment challenges is narrow," and "successful Eighth Amendment challenges to prison-term lengths will be rare." *Id.* (internal quotation marks, brackets, and citation omitted).

When assessing whether a sentence is unconstitutionally disproportionate, this court first makes a threshold comparison of the gravity of the offense against the severity of the sentence. *McGruder*, 954 F.2d at 316. Only if we determine that the sentence is "grossly disproportionate to the offense" will we compare Hodges' sentence to sentences for similar crimes in this and other jurisdictions.[2] *Id.*

Hodges' sentence was not grossly disproportionate to the offenses he committed. The jury found that he robbed a bank with a weapon, then robbed four more banks, again with a weapon. Each robbery was a "crime of violence." 18 U.S.C. § 924(c). The 1,284-month portion of the sentence he challenges is based on the five convictions for use of a firearm during a crime of violence. *See id.* The sentences assessed for these five convictions were all mandatory

---

[2] The test in *McGruder* is based on this court's interpretation of *Harmelin v. Michigan*, 501 U.S. 957 (1991). Hodges alleges in his reply brief that the *McGruder* court misinterpreted the seven opinions in *Harmelin*, and supports this by citing to a Wikipedia entry for *Harmelin*. The *McGruder* court, however, explicitly stated it was following Justice Kennedy's opinion in *Harmelin* when it devised the test for assessing disproportionality claims. Hodges' argument is meritless.

minimums; the last four were 25-year mandatory minimums assigned to repeat weapons offenders. *Id.*

The 1,284-month portion of the sentence was the result of a Congressional decision to establish mandatory minimum sentences for certain weapons offenses. *See id.* As the Supreme Court has written in a three-strikes case, the defendant's "sentence is a long one. But it reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated." *Ewing v. California*, 538 U.S. 11, 30 (2003).

For these reasons, Hodges' sentence does not constitute cruel and unusual punishment in violation of the Eighth Amendment.

## VI.    *Hodges – Juror Bias*

Hodges argues that juror misconduct and bias warrant a new trial or an evidentiary hearing on the juror's impartiality. He claims a juror knew him before trial, did not disclose the relationship during *voir dire*, and made biased statements during trial to Hodges' sister-in-law. Hodges did not raise this issue with the district court until shortly after the jury issued its verdict.

A party seeking a new trial for juror misconduct must "first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991) (internal quotation marks and citation omitted). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* (internal quotation marks and citation omitted). As a result, there must be proof of juror bias. *United States v. Scott*, 854 F.2d 697, 698-99 (5th Cir. 1988).

A defendant may show either actual or implied juror bias. "Actual bias exists when a juror fails to answer a material question accurately because he is

biased." *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001) (citation omitted). This is shown through admission or factual proof. *Id.* Juror bias may also be implied in "extreme circumstances," as in "when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial." *Id.*

We review the district court's decision to deny a motion for new trial on the basis of juror bias for an abuse of discretion. *Id.*

Here, the juror did not disclose any relationship with Hodges during *voir dire*. There is no evidence, though, that this was a misrepresentation. Hodges did not offer evidence that the juror even knew him. Therefore Hodges has not shown actual bias. As for implied bias, the district court found that Hodges' claim "does not even come close to one of these extreme circumstances" that would warrant such a finding. Hodges even acknowledges that "the signs suggest that [the juror] was favorably disposed to Hodges and felt that he could be amply fair."

The district court did not abuse its discretion in denying Hodges' motion for an evidentiary hearing or new trial.

The defendants' convictions and sentences are AFFIRMED.