# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 17, 2011

No. 09-40978

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RAUL SANCHEZ-MORALES

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:09-CR-404-1

Before JONES, Chief Judge, JOLLY, and GARZA, Circuit Judges.

PER CURIAM:[*]

Raul Sanchez-Morales was charged with two counts of transporting illegal aliens within the United States by means of a motor vehicle, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and § 1324(a)(1)(B)(ii). At the close of the Government's case, Sanchez-Morales unsuccessfully sought a judgment of acquittal. He did not put on a case in his defense, choosing instead to rely on the argument that the Government failed to carry its burden of proof. The jury convicted Sanchez-Morales on both counts. He raises only one issue on appeal:

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-40978

whether the evidence was sufficient to support his conviction. For the reasons stated herein, we affirm.

On the afternoon of the events in question in this case, Three Rivers Police Department Officer Jesus Rodriguez stopped a car heading northbound on Highway 281 for carrying an expired inspection sticker. Sanchez-Morales was driving; a woman—now identified as Raquel Abigail Mendieta-Gonzalez—was seated in the front passenger seat; and three men were in the back seat. One of the male passengers was sitting on the floorboards. Officer Rodriguez testified that the passengers' clothing was "filthy" and that the passengers "looked just hot and sweaty" and "like they hadn't bathed in days." Officer Rodriguez also noted some half-full water bottles in the car. Officer Rodriguez testified at trial that Sanchez-Morales told him that he and the passengers were from Mexico. Although Sanchez-Morales was able to produce proof of insurance, his only form of identification was a Mexican identification card. Officer Rodriguez spoke to the passengers and confirmed that they were from Mexico. He called United States Customs and Border Patrol ("CBP").

CBP Agent Roman Salinas received the call and came to the scene. When he arrived, he found Sanchez-Morales and his passengers handcuffed and sitting down. Agent Salinas testified that four of the five handcuffed individuals appeared dirty, while one appeared clean. He testified that Mendieta-Gonzalez was "limping pretty bad" and told him that she had sprained her ankle and had a blister on her foot. Agent Salinas spoke with the handcuffed individuals to confirm their citizenship and nationality, after which he advised them of their rights and transported them to a CBP station. Agent Salinas testified that some of the individuals had scratches and some asked him for water. He said they had no luggage and smelled of sweat and brush, "like they'd been out in the woods a couple days." He ran background checks and confirmed the passengers' immigration status.

No. 09-40978

Border Patrol Agent Luis Solis testified that, at the time, he was a prosecutions officer at the CBP station. The morning after Sanchez-Morales was originally detained, Agent Solis gave Sanchez-Morales a copy of the complaint against him, advised him of his rights, and explained how the criminal process would ensue. Sanchez-Morales stated that he had lied to the officials earlier and that the reason he had lied was that he feared retaliation if he were to tell the truth. We do not know, from the record, what earlier statement was supposedly a lie. Agent Solis, who interacted with Mendieta-Gonzalez as well as Sanchez-Morales, testified that Mendieta-Gonzalez was "very sore" and "could hardly walk." He testified that, when it came time to transport her, she needed help getting into a van.

Two of the passengers were held as material witnesses: Mendieta-Gonzalez and her husband, Miguel Guerrero-Villarreal. They gave sworn statements to CBP agents. The parties filed a stipulation in the district court that, if Mendieta-Gonzales and Guerrero-Villarreal were present in court and under oath, they would have testified in accordance with their statements. Mendieta-Gonzalez and Guerrero-Villarreal's statements were admitted into evidence, and Mendieta-Gonzalez and Guerrero-Villarreal did not testify at trial. Guerrero-Villarreal stated that he was a citizen of Mexico with no documentation authorizing his presence in the United States. According to Guerrero-Villarreal, he met a young man in Matamoros, Tamaulipas, Mexico, who agreed to help him cross into the United States in exchange for $600. After crossing the river, Guerrero-Villarreal and others walked to a nearby area in the brush where they were picked up by a man in a pick-up truck. The man drove them to a brick house in Brownsville, where they made arrangements with the homeowner to be smuggled to Houston, Texas, in exchange for $1,800. One day later, a man in a different pick-up truck drove them for "about one and a half to two hours" to an unknown location near the brush. Guerrero-Villarreal

3

continued that he and seven others, including a guide, were dropped off near the brush. The party walked in the brush for two days and three nights, resting occasionally. The guide finally brought them to a house near the side of the road. Approximately five hours later, a man in a green vehicle, later identified as Sanchez-Morales, arrived. Guerrero-Villarreal stated that it was his understanding that Sanchez-Morales was there to take them to Houston, and that Guerrero-Villarreal was to pay another party $1,800 in Houston. The guide told Guerrero-Villarreal, Mendieta-Gonzalez, and two others to get in Sanchez-Morales's vehicle. After driving for an hour, the car was stopped by police. Guerrero-Villarreal confirmed that Mendieta-Gonzalez traveled with him the entire way. Mendieta-Gonzalez told a similar story, adding that she injured her ankle and developed a large blister while walking through the brush. She stated that Sanchez-Morales did not speak to her while he was driving, but that she believed Sanchez-Morales knew she was in the country illegally because it was "obvious." Guerrero-Villarreal similarly stated that he believed that Sanchez-Morales knew of his immigration status. As Sanchez-Morales correctly points out, however, neither witness revealed direct knowledge of Sanchez-Morales's state of mind.

"We review a claim of insufficiency of the evidence narrowly and affirm if a rational trier of fact could have found the evidence established the essential elements of guilt beyond a reasonable doubt." *United States v. Villegas-Rodriguez*, 171 F.3d 224, 227-28 (5th Cir. 1999) (citations omitted). "Our role does not extend to weighing the evidence or assessing the credibility of witnesses." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). "[A]ll reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Thomas*, 627 F.3d 146, 154 (5th Cir. 2010) (citations and quotation marks omitted). "'Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of

innocence.'" *United States v. Dien Duc Huynh*, 246 F.3d 734, 742 (5th Cir. 2001) (quoting *United States v. Mendoza*, 226 F.3d 340, 343 (5th Cir. 2000)). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, . . . be sufficient to constitute conclusive proof." *Thomas*, 627 F.3d at 154 (citations and quotation marks omitted). "[T]he jury is free to choose among reasonable constructions of the evidence." *Lopez*, 74 F.3d at 577 (citing *United States v. Salazar*, 66 F.3d 723, 728 (5th Cir. 1995)).

A conviction for transportation of illegal aliens in violation of §§ 1324(a)(1)(A)(ii) and (B)(ii) requires that the Government show beyond a reasonable doubt that "(1) an alien entered or remained in the United States in violation of the law, (2) [the defendant] transported the alien within the United States with intent to further the alien's unlawful presence, and (3) [the defendant] knew or recklessly disregarded the fact that the alien was in the country in violation of the law." *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002) (citations omitted). Sanchez-Morales does not dispute that the Government established the first of these elements; rather, he argues that the evidence is insufficient to support his conviction in two regards: first, the evidence is insufficient to show that Sanchez-Morales transported Guerrero-Villarreal and Mendieta-Gonzalez with the intent to further their unlawful presence; and second, the evidence is insufficient to show that he knew, or recklessly disregarded, the fact that Guerrero-Villarreal and Mendieta-Gonzalez were in the country in violation of the law. The Government counters that the jury permissibly gleaned Sanchez-Morales's knowledge and intent to further from the evidence in the record regarding his activities and behavior on the day of the arrest, the physical appearance and condition of his passengers, and his later admission that he lied to police.

Upon review of the record, we agree with the Government. Mendieta-Gonzalez and Guerrero-Villarreal paid third parties to smuggle them into the

No. 09-40978

United States, and it was through the actions of those third parties that they eventually came into contact with Sanchez-Morales. Sanchez-Morales picked up his passengers and drove them, largely without speaking, north toward their destination. Testimony showed that those passengers were not merely dirty, but were dressed in filthy clothing and smelled strongly of body odor and brush. Mendieta-Gonzalez was, despite her young age,[1] in readily observable poor physical condition. All of these facts are consistent with the inferences that Sanchez-Morales must have known that his passengers were in the process of completing a physically taxing illegal migration, and that, by driving them, he intended to act in furtherance thereof. After he was detained, moreover, Sanchez-Morales stated that he had lied to officials out of fear of retaliation, strongly corroborating the inference that he knew he was acting in furtherance of illegal activity. Construing the evidence in the light most favorable to the verdict, and permitting the jury all reasonable inferences, we find the foregoing facts sufficient to support conviction.

For the reasons above, the judgment of the district court is AFFIRMED.

---

[1] She stated that she was born in 1985.

6