# United States Court of Appeals for the Fifth Circuit

---

No. 24-30315

---

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2026

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

SHIVA AKULA,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CR-98-1

---

Before SMITH, WIENER, and HIGGINSON, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

A jury convicted Dr. Shiva Akula of twenty-three counts of health care fraud due to his company's fraudulent Medicare billing practices. On appeal, Dr. Akula challenges the district court's decision not to certify his witness as an expert on Medicare billing and coding, the sufficiency of the evidence supporting his convictions, and his above-Guidelines sentence. Finding no error, we AFFIRM.

No. 24-30315

I.

Since 1993, Dr. Akula, an infectious disease doctor in New Orleans, has owned a healthcare company known as Canon Healthcare, LLC ("Canon"). Canon maintained locations throughout Louisiana and Mississippi, with its New Orleans office as its primary location. As a hospice business, Canon treated patients with terminal illnesses likely to die within six months. Canon contracted with doctors from Ochsner Health System to provide medical care to Canon's hospice patients.

Dr. Akula directed Canon's daily operations, including its Medicare billing. Beyond overseeing billing, his responsibilities included hiring nurses, nurse practitioners, and administrative staff, including office administrators Sue May, Kelly Anderson, and Joshua Bruce. Dr. Akula also employed and supervised members of his family to handle Medicare billing in Canon's New Orleans office: his sister Krishna Biyyam and brother-in-law Raj Biyyam. At all relevant points, Dr. Akula signed Canon's Medicare enrollment documents, agreeing that he was bound to comply with all the rules and regulations surrounding the program.

Canon primarily billed Medicare for four different levels of hospice care, which were reimbursed at per diem rates: Routine Care, which is the default rate, under which a patient receives home hospice care; Respite Care, the rate for a five-day-maximum care period in which patients enter a facility while their caregivers rest; General Inpatient Care ("GIP"), a rate used for patients who suffer an acute event that can only be addressed in an inpatient setting; and Continuous Care, the rate used when a patient is in medical crisis and must be cared for around-the-clock until their condition improves. Continuous Care is reimbursed at the highest rate, while GIP holds the second highest reimbursement rate. Canon maintained a practice of

No. 24-30315

uniformly billing patients at the GIP rate, making sure to keep the inpatient units full to support billing at the higher rate.

In addition to the improper GIP billing, Canon billed Medicare for additional services covered by Current Procedural Terminology ("CPT") codes,[1] which is not standard practice for hospice care. Specifically, Canon billed Medicare for the following codes: CPT code 99236, the code for completing medical History and Physical Forms ("H+Ps"), even though Canon did not complete these forms but merely copied H+Ps that were completed by other physicians; CPT code 99233, the code for inpatient physician services, despite Canon's providing no additional inpatient services not already covered by the GIP-billed services; and CPT code 99350 for at-home physician services, despite no Canon physician's providing additional at-home services. These codes covered services that were already included in the hospice per diem rates.

Canon first faced scrutiny over its Medicare billing in 2015. In August of that year, Medicare contractor AdvanceMed contacted Canon by letter to inform the company that, on an audit of thirty submitted claims, "[t]hirty of thirty claims were denied or 100% of the reviewed claims failed to meet existing Medicare coverage policies and were denied." AdvanceMed explained that the claims lacked sufficient documentation and were improperly coded, resulting in Medicare's overpaying Canon by $383,107.26. Specifically, the letter noted the frequency of Canon's billing

---

[1] CPT codes are listings "of terms and five-digit codes that primarily describe medical services and procedures performed by physicians and other qualified health care professionals." *CPT Code Set Overview*, Am. Med. Ass'n. (Jan. 23, 2026), https://www.ama-assn.org/practice-management/cpt/cpt-code-set-overview [https://perma.cc/8FE3-BQNQ].

No. 24-30315

for GIP without adequate documentation, and it explicitly mentioned that GIP has a higher reimbursement rate than Respite Care or Routine Care.

Dr. Akula received the letter, but he did not inform anyone at Canon as to its contents and made no changes to Canon's Medicare billing practices. AdvanceMed audited Canon for a second and third time in February and August 2017, respectively, which unearthed the same billing issues as the first audit in August 2015.

In total, from January 2013 to December 2019, Canon billed Medicare for $84,140,601 and received approximately $42,121,349 in payments.

On August 5, 2021, a federal grand jury returned an indictment charging Dr. Akula with twenty-three counts of healthcare fraud in violation of 18 U.S.C. § 1347. Counts 1–8 involved fraudulent billing at the GIP level; Counts 9–11 were for Canon's fraudulent billing for H+Ps under CPT code 99236; Counts 12–17 were for fraudulent billing regarding physician services under CPT code 99233; and Counts 18–23 were for fraudulent billing for physician services during home visits under CPT code 99350. Dr. Akula pleaded not guilty to all counts and proceeded to trial.

Three aspects of Dr. Akula's trial are of particular relevance to his challenges on appeal. We discuss each in turn.

## A. Expert Testimony

Prior to trial, both the Government and Dr. Akula notified the district court of their intent to present expert testimony on medical billing. The Government sought to introduce expert testimony of Laurie McMillan, a registered nurse, certified professional coder, and certified fraud examiner, with over forty years of experience serving as an expert witness and as a billing and coding expert. After reviewing Canon's patient files on a patient-by-patient analysis, McMillan opined that Canon's plans of care and

documented treatment "did not support the general inpatient level of care or additional physician charges as required under the Medicare hospice benefit regulations." Consistent with her export report, McMillan testified at trial about Canon's lack of documentation to support the levels of care billed to Medicare, underscoring the extent of the billing errors and irregularities that were central to the Government's case against Dr. Akula.

To rebut McMillan's testimony, Dr. Akula sought to introduce the expert testimony of Dr. Gregg Davis, an outpatient family medicine physician and former medical director of several nursing facilities. Dr. Davis also had experience billing and coding for Medicare as a solo practitioner. To learn to bill for Medicare, Dr. Davis attended a twelve-to-sixteen-hour in-person class for certified coders and billers and passed the requisite examination. However, Dr. Davis did not obtain the certification required to be a certified professional coder, had never lectured or written on Medicare billing, and had never been qualified as an expert in the field.

Dr. Davis's expert report opined on the standard of medical care received by various Canon hospice patients to rebut McMillan's report's findings. Dr. Davis's report did not contain opinions on proper Medicare billing procedures and coding practices. Nevertheless, at trial, the defense sought to introduce Dr. Davis as an expert on medical billing and coding. The district court declined to qualify Dr. Davis as an expert in Medicare billing, coding, and practice because it found that Dr. Davis lacked relevant training and expertise in the field. The court did, however, qualify Dr. Davis as an expert in clinical decision-making for patient hospice eligibility, consistent with the contents of his expert report.

## B. Evidence at Trial

The Government presented evidence from numerous witnesses, including doctors, office administrators, a Medicare billing expert, a quality

assurance specialist, and director of inpatient nursing, all of whom testified as to the irregularities and discrepancies replete within Canon's hospice and billing practices and Canon's repeated failure to provide documentation to support its billed levels of care. Several witnesses also testified to Dr. Akula's control over and involvement in Canon's billing. For example, Sue May, licensed practical nurse and administrator for Canon's New Orleans office, testified that Dr. Akula exercised control over employees responsible for the billing, who were primarily his own family members. She testified that she did not know how to use Canon's medical record software to verify billing, but Dr. Akula "managed what happened in billing." Dr. Oren Blalock, a physician who treated Canon patients, testified that, when he learned Canon was improperly billing Medicare for medical services he never provided, he approached Raj Biyyam. He then received a phone call from Dr. Akula, who said "to not bother Raj anymore with . . . questions and that" the issues would get worked out.

At trial, Dr. Akula's counsel conceded during opening statements that there were "open, transparent, [and] obvious billing error[s]" at Canon and that Raj Biyyam oversaw Canon's Medicare billing and consistently entered incorrect billing codes. Dr. Akula also testified, admitting there were billing mistakes and that Canon should not have received Medicare funds for several claims.

Dr. Akula also called two witnesses in his defense: (1) Ashok Etikyala, a family member and Canon employee, who testified about Canon's billing practices and that he never saw Dr. Akula discussing billing with other family member employees, and (2) Dr. Davis, who was qualified to testify about the clinical evaluation and hospice referral for particular Canon patients.

No. 24-30315

Following the five-day trial, the jury convicted Dr. Akula on all counts. The district court denied both of Dr. Akula's motions for a judgment of acquittal and for a new trial.

## C. Sentencing

Dr. Akula objected to portions of his Presentence Investigation Report ("PSR") prepared by the Probation Office, and at sentencing, the district court provided Dr. Akula with an opportunity to explain some of his objections, particularly as to paragraphs 40–52 of the PSR. Dr. Akula explained that he did not oversee the day-to-day operations and "billing part" of Canon, but other administrators and employees were responsible for misconduct. He also urged the culpability of other witnesses, Canon's processes while billing Medicare, and other challenges to the Government's case. The court overruled Dr. Akula's objections to paragraphs 40–52, finding that most of the objections "were directed to the defendant's contention that he's not guilty."

The district court calculated Dr. Akula's Guidelines range to be from 151 to 188 months. The district court denied Dr. Akula's request for a downward variance and departure based on his advanced age and physical health and explained it was considering an upward variance. The Government also advocated for an upward variance or "at the very least [a sentence] at the high end of the guidelines range."

After allocution and character testimony from Dr. Akula's son, the district court imposed an upward variance of 52 months and sentenced Dr. Akula to 240 months of imprisonment.[2] The court ordered that Dr. Akula

---

[2] The district court imposed a sentence of 120 months as to each of Counts 2 and 5, to be served consecutively, and 120 months as to Counts 1, 3, 4, and 6 through 23 to be served concurrently to the sentences imposed for Counts 2 and 5.

pay $42,121,557.53 in restitution and also sentenced him to three years of supervised release.

Relying on the factors set forth in 18 U.S.C. § 3553(a), the district court specifically found that an upward variance was warranted. The district judge explained that, in his more than 30 years on the bench, he "had never seen a white-collar defendant less accepting of responsibility than Dr. Akula," and that the defendant "prefers to place responsibility on others." The court cited Dr. Akula's repeated bond violations, violations of court orders, and bond revocation in support of an upward variance as examples of the pervasiveness of Dr. Akula's misconduct. The court also referenced emails sent and recorded phone calls placed by Dr. Akula while incarcerated, wherein he accused his counsel, the district court, and the Government of working against his interest, as well as Dr. Akula's numerous bar complaints filed against former attorneys and his civil RICO claim. The court explained that these actions informed the sentence because they reflected the defendant's "disrespect for the rule of law." The court also emphasized the deterrent effect of the sentence, noting that healthcare professionals and other businesses throughout the region "will pay attention to Dr. Akula's sentence and his conduct." Finally, the court explained the need for the sentence to promote respect for the law, given that Dr. Akula's conduct "causes other Americans to question the integrity of government programs designed to help those who are most in need."

Dr. Akula timely appealed his convictions and sentence, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

Dr. Akula raises three issues on appeal. First, he argues that the district court abused its discretion in declining to certify Dr. Gregg Davis as an expert in Medicare billing and coding. Second, Dr. Akula argues that the

Government failed to present sufficient evidence that he knowingly or willfully committed health care fraud, and as a result, the district court abused its discretion in denying his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Third, Dr. Akula argues that the district court's imposition of an upward variance resulted in an unconstitutionally excessive and substantively unreasonable sentence. We address each issue seriatim.

## A.

Dr. Akula's challenge to the district court's refusal to certify Dr. Davis as an expert on Medicare billing and coding fails because any error was harmless. We review a district court's decision to exclude expert testimony for abuse of discretion, *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) (en banc) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997)). The district court was attentive to Dr. Davis's lack of credentials in medical billing and coding, his lack of relevant certifications, and the fact that he had never been qualified as an expert in the field. Regardless, we "will not overturn a conviction based on the exclusion of evidence unless a reasonable probability exists that the error contributed to conviction." *United States v. De Leon*, 728 F.3d 500, 505 (5th Cir. 2013) (internal quotation marks omitted).

No such reasonable probability exists here. Dr. Akula argues that Dr. Davis would have testified that Canon *properly* billed Medicare. But that testimony would have sharply contrasted with Dr. Akula's own testimony and theory of defense at trial that Canon committed billing and coding errors, but the errors were caused by others. Notably, Dr. Davis was still able to testify as to his clinical impressions of several Canon patients as detailed in his expert report and rebut Government-witness McMillan's testimony to that effect. Further, the Government put forth numerous witnesses to testify

as to Canon's billing and coding errors and Dr. Akula's role in the scheme. Given the overwhelming evidence of Dr. Akula's guilt, there is no reasonable probability that the exclusion of Dr. Davis's testimony on billing and medical coding contributed to Dr. Akula's conviction. *Id.* at 505–06; *United States v. Kuhrt*, 788 F.3d 403, 422 (5th Cir. 2015) ("Because there was ample evidence supporting . . . that Appellant[] actively committed criminal fraud—the testimony . . . was not indispensable, nor was its exclusion harmful error.").

B.

Next, we consider Dr. Akula's sufficiency of the evidence challenge and determine that it, too, fails. Dr. Akula preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal. *United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021). "We review preserved challenges to the sufficiency of the evidence de novo, but we are highly deferential to the verdict." *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018) (citation modified). "[I]t is not the reviewing court's role to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,'" but instead to question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Terry v. Hooper*, 85 F.4th 750, 754 (5th Cir. 2023) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

A person commits health care fraud by "knowingly and willfully" executing a scheme "to defraud any health care benefit program," such as Medicare, or by obtaining "by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235–36 (5th Cir.

2014) (quoting 18 U.S.C. § 1347). The Government must prove the defendant's knowledge and specific intent to defraud. *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). Relevantly, proof may be inferred from circumstantial evidence. *Id.* at 340.

Here, Dr. Akula challenges the sufficiency of the evidence to support his convictions for health care fraud, arguing that the Government's evidence only established "a consistent pattern of poor documentation (medical records) or incorrect coding," not that "Dr. Akula directed any employee to ignore medical records or change diagnosis codes to trigger higher Medicare reimbursements." He further argues that his testimony revealed that he lacked the requisite *mens rea* to support a conviction for health care fraud.

Again, Dr. Akula does not dispute that Canon's Medicare billing contained numerous obvious errors and that Canon wrongly received Medicare funds as a result. The sole issue is whether the Government's evidence sufficiently demonstrates Dr. Akula's intent to commit health care fraud.

We are satisfied that it does. The Government presented evidence that Dr. Akula, on receiving the 2015 audit letter which notified Canon that it had failed 100 percent of its audited claims, did not share the letter with Canon billing staff and did not instruct staff to change company billing practices. A reasonable jury could infer from this circumstantial evidence that Dr. Akula was aware of Canon's improper billing procedures and knowingly decided to continue in the fraudulent scheme. *See United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017) ("As for the alleged absence of evidence showing fraudulent intent, the mindset needed for fraud . . . can be, and usually is, proven by the circumstances."). Additionally, the Government presented evidence from several witnesses that Dr. Akula

oversaw and directed his family members who conducted Canon's billing and that he rebuked Canon staff and doctors who inquired further into any suspected wrongdoing. Dr. Akula, as Canon's owner, signed Medicare enrollment documents and represented that he had an affirmative obligation to comply with Medicare's laws and regulations. And the jury was free to credit the Government's evidence, and especially to discredit Dr. Akula's testimony that other Canon staff members were responsible for the billing fraud. *See United States v. Gibson*, 875 F.3d 179, 187 (5th Cir. 2017) (explaining that, when a defendant "shifted blame to supposedly rogue subordinates," a rational juror "could have disbelieved his account and credited instead" the testimony of other witnesses); *Willett*, 751 F.3d at 342 ("[T]he fact that another employee also had supervisory authority does not negate the inference that can be drawn from [the defendant's] role in the business.").

Based on the evidence presented at trial, a reasonable jury could have found that Dr. Akula knowingly and willfully defrauded Medicare. *See, e.g.*, *Imo*, 739 F.3d at 237. Thus, Dr. Akula's sufficiency challenge is without merit.

## C.

Finally, Dr. Akula asserts that the district court's decision to impose an upward variance resulted in an unconstitutionally excessive sentence of 240 months' imprisonment. He also challenges the substantive reasonableness of his sentence on the grounds that the district court inappropriately weighed his "pre-trial behavior, the amount of [the] supposed loss, and the defendant's failure to accept responsibility" to the

exclusion of other relevant factors, such as his age and poor medical condition.

Because Dr. Akula concedes he did not raise an Eighth Amendment challenge to his sentence before the district court, we review the claim for plain error. *United States v. Ayelotan*, 917 F.3d 394, 406 (5th Cir. 2019). The Eighth Amendment prohibits sentences that are "grossly disproportionate" to the severity of the crime. *See United States v. Thomas*, 627 F.3d 146, 160 (5th Cir. 2010). On appellate review, we do not "substitute [our] judgment for that of the legislature nor of the sentencing court as to the appropriateness of a particular sentence," and we "decide only if the sentence is within the constitutional limitations." *United States v. Harris*, 566 F.3d 422, 436 (5th Cir. 2009). Successful Eighth Amendment challenges are rare. *Id.* To evaluate an Eighth Amendment claim, we first make "a threshold comparison of the gravity of the offense against the severity of the sentence." *Thomas*, 627 F.3d at 160 (citing *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992)). Only if we determine that the sentence is grossly disproportionate to the offense will we compare the defendant's sentence to sentences imposed in other cases for similar crimes. *Id.*

Dr. Akula's 240-month sentence is not grossly disproportionate to the gravity of his offense. He is responsible for over $84 million in fraudulent billing to Medicare over the course of several years, which is a significant sum. And pursuant to 18 U.S.C. § 1347, for Counts 1 through 23, the maximum term of imprisonment for each count is ten years. The statutory maximum is 230 years, if the court had imposed a consecutive sentence on each count. Because Dr. Akula has not demonstrated that his 20-year sentence is grossly disproportional to his offense, he has failed to show a clear or obvious Eighth Amendment error, and we need not compare his sentence to other sentences as a result. *Id.*

No. 24-30315

As to Dr. Akula's second challenge to his sentence, we review a preserved objection to a sentence's substantive reasonableness for abuse of discretion, examining the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 51 (2007). "A non-Guideline sentence unreasonably fails to reflect the statutory sentencing factors where it (1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Smith*, 440 F.3d 704, 708 (5th Cir. 2006).

For one, as explained above, the district court's sentence was within the statutory maximum, which we have recognized as a factor weighing in favor of a sentence's substantive reasonableness. *United States v. Hudgens*, 4 F.4th 352, 359 (5th Cir. 2021) (collecting cases upholding "major" upward variances). And while the district court imposed a 52-month upward variance, resulting in an above-Guidelines sentence, it appropriately balanced several of the § 3553(a) factors and explained its reasons for doing so at length, including "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed to reflect the seriousness of the offense," the need to "promote respect for the law and to provide just punishment for the offense," "the need to afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." The court also considered "the kinds of sentences available, the sentencing ranges, the applicable guidelines and policy statements and the need to avoid unwarranted sentencing disparities amongst defendants with similar records who have been found guilty of similar conduct."

Finally, Dr. Akula's argument that the court impermissibly penalized him for maintaining his innocence, his lack of remorse, and for his other pre-trial conduct is without merit. The court balanced several of the § 3553(a)

factors in a lengthy explanation of its sentence. It cited "the millions of dollars stolen" to demonstrate the seriousness of the offense. The court explained that the sentence promoted respect for the law given Dr. Akula's refusal to accept responsibility, continued blaming of others for wrongdoing, repeated violation of court orders and the terms of his bond, and disrespect for the Medicare system, which is built on trust and designed to help those in need. *See United States v. Douglas*, 569 F.3d 523, 527 (5th Cir. 2009) (recognizing that "lack of remorse" is an appropriate sentencing factor). The district court also explained that its sentence reflected the need to deter criminal conduct generally, stating that "healthcare professionals and other business, people both in the Eastern District of Louisiana and elsewhere, will pay attention to Dr. Akula's sentence and his conduct." Accordingly, we cannot say the district court erred in its balancing of the sentencing factors. *Gall*, 552 U.S. at 59 (explaining that "it is not for the Court of Appeals to decide de novo whether the justification for a variance is sufficient or the sentence reasonable," but that on abuse-of-discretion review, appellate courts should defer to the district court's balancing of the § 3553(a) factors).

## III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.