**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 91-7212

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

VERSUS

LUIS MARTINEZ,

DEFENDANT-APPELLANT.

Appeal from the United States District Court
For the Southern District of Mississippi

(October 6, 1992)

Before REYNALDO G. GARZA, DAVIS and BARKSDALE, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Appellant, Luis Martinez, challenges his conviction of conspiracy to possess with intent to distribute 1.56 kilograms of cocaine in violation of 21 U.S.C. 846. Finding no reversible error we AFFIRM.

Background

On December 29, 1988 a Juan Castellanos used his credit card to rent a car in Miami and designated his brother-in-law, Martinez, as an authorized driver. Martinez, together with his wife and two children, proceeded to their destination, New Orleans. The vehicle

broke down in Daytona on December 30 and Martinez signed for a replacement, a white Ford Tempo. They arrived in New Orleans on December 30 and were reunited with an old-time friend, Juan Peinado. Martinez testified that he then gave the car to a Carlos Sacerio on January 3rd to return to Miami by the 4th, the due date, to avoid the drop-off fee.

On January 6th, Mississippi State Highway Patrolman Howard Potts stopped the vehicle in Gulfport for speeding as it was heading west on Interstate 10 towards New Orleans. The driver, an Oscar Rubio, showed Potts the rental papers showing Martinez as an authorized driver. Rubio told the officer that he was delivering the car to Luis Martinez in New Orleans. He went on to say that Martinez had spoken to him on the phone in Miami and had told Rubio that he wanted to fly back to New Orleans. Officer Potts impounded the vehicle because Rubio's license was suspended and he wasn't an authorized driver according to the rental papers in his possession. Rubio consented to the vehicle being searched and actually fell asleep during the wait. At that time the search failed to reveal anything suspicious and Rubio was driven to the Gulfport bus station. The car's odometer indicated that the car had been driven 2,891 miles since Martinez initially got it in Daytona. The mileage was consistent with testimony that the car was driven to New Orleans, back to Miami and then again North through Florida and then West to Gulfport, 60 miles outside of New Orleans.

Rubio testified that he then called Martinez who instructed him to proceed to New Orleans and that he would pay for his trip

2

back to Miami. Armand Baralt, an attorney from New Orleans, testified that Martinez hired him at $60 an hour to help him get the car back. There was a meeting the next day, Saturday the 7th, at the Howard Johnson's hotel in New Orleans that was attended by Martinez, Peinado, Sacerio, Rubio and Baralt. The situation was discussed at length and Baralt proceeded to call Hertz using the alias of Lee Collins to find out how to retrieve the vehicle. Officer Potts had left instructions to be notified regarding any inquiries for the vehicle. Officer Potts ordered another search when his suspicion was aroused and discovered 1.56 kilograms of cocaine hidden in the car's steering column and dashboard. After several phone calls to Hertz over the weekend, the group decided to go to the Gulfport office Sunday evening, January 8th, to reclaim the Ford Tempo.

Martinez, Peinado and Baralt arrived at the Gulfport Hertz parking lot at 8:45 P.M., 15 minutes before closing. They waited for a few minutes before entering the office. They walked past the counter but returned quickly. Martinez testified that he wanted to drive the car back to Miami to avoid a drop-off charge. Narcotics Agent Sandefer, posing as a Hertz employee, accompanied the trio to the car in the parking lot. Baralt walked to his car while Martinez and Peinado went directly to the Ford Tempo. At this point all three men were placed under arrest. Sacerio and Rubio arrived a short time later and were also arrested.

Baralt, Peinado, Sacerio and Rubio were tried together and, all except for Baralt, were convicted of possession of cocaine and

3

conspiracy to possess cocaine with the intent to distribute. Sacerio and Rubio's convictions were subsequently overturned for insufficiency of evidence and Peinado has not appealed his conviction. United States v. Sacerio, 952 F.2d 860 (5th Cir. 1992). Martinez was tried separately on both counts and was found guilty on the conspiracy charge. He was sentenced to 97 months imprisonment and 4 years supervised release.

## Analysis

Martinez appeals his conviction on insufficiency of evidence grounds. The standard of review for sufficiency of evidence is whether any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Anderson, 933 F.2d 1261, 1274 (5th Cir. 1991). All reasonable inferences from the evidence must be construed in favor of the jury verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). Determining the weight and credibility of the evidence is within the sole province of the jury. United States v. Pena, 949 F.2d 751, 756 (5th Cir. 1991). An appellate court will not supplant the jury's determination of credibility with that of its own. United States v Barron, 707 F.2d 125, 127 (5th Cir. 1983).

The jury in this case chose not to believe Martinez's testimony. All of the evidence together meets the sufficiency threshold to uphold the conviction. "Circumstances altogether inconclusive, if separately considered, may, by their number and

4

joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." Coggeshall v. United States (The Slavers, Reindeer), 69 U.S. (2 Wall.) 383, 17 L.Ed 911, 914-15 (1865). The government had to prove three elements to convict of drug conspiracy: 1) the existence of an agreement to possess with intent to distribute cocaine, 2) Martinez's knowledge of that agreement and 3) Martinez's voluntary participation. United States v. Alvarado, 898 F.2d 987, 992 (5th Cir. 1990).

There was enough evidence to prove all three elements. First there was the rental agreement in Rubio's possession and Rubio's testimony that he was supposed to deliver the car directly to Martinez in New Orleans and that when Martinez had spoken to him on the phone in Miami, Martinez had stated that he wanted to fly instead of driving back. Baralt, a defense witness and prior attorney for Martinez, confirmed that indeed Martinez had told him that he wanted to fly in from Miami and that he was expecting delivery of the car in New Orleans. This evidence together with the discovery of 1.56 kilograms in Martinez's rented car and his voluntary participation in the meeting with all of the parties and his eagerness to pick up the car personally with the other four men all support the three necessary elements. Martinez was involved in an agreement with others to obtain a large quantity of cocaine with the obvious intention to distribute and his involvement throughout was voluntary.

The rest of the facts and evidence also point to a drug

conspiracy. Rubio testified that he called Martinez immediately after the vehicle was impounded and that Martinez asked if he had been arrested and then instructed him to proceed to New Orleans and that he would pay for his trip back to Miami. There was no testimony that Martinez had called Hertz to inquire whether his rented car was delivered in Miami by the due date, January 4th, and if not, to explain its delay. Logically it would be expected, at a minimum, that Martinez would do this or possibly even report the car missing since he testified he had not seen or heard of the car in 3 days.

Baralt also testified that Martinez had hired him at $60 an hour to assist him reclaim the car. This seems like an overreaction for an innocent impoundment of a rental car due to its use by an unauthorized driver. Martinez's contention that he was penniless is contradicted by the testimony that he quickly hired an attorney, that he flew in from Miami and his promise to finance Rubio's return trip. Evidence that Martinez was well dressed when arrested plus his apparent non-action regarding extra day charges also weakens his argument. Martinez claimed that his clothes were lent to him by Peinado straight from his closet. This was suspicious since Peinado is 5 inches taller and 35 pounds heavier.

Further incriminating evidence was the meeting attended by Martinez, Peinado, Baralt, Sacerio and Rubio. Baralt stated that the meeting took several hours. All this effort by these 5 men is hard to comprehend for just a simple innocent retrieval of a rented Ford Tempo. Baralt felt compelled to use an alias, Lee Collins, to

6

obtain routine information on how to reclaim the impounded rental. Further support for the drug conspiracy was the discovery of 22 grams of cocaine found out in the open on a nightstand in the hotel room Martinez admitted meeting in. "Although each element of the conspiracy charge must be proved beyond a reasonable doubt, no element need be proved by direct evidence, but may be inferred from circumstantial evidence. An agreement may be inferred from `concert of action.'" United States v. Espinoza-Seanez, 826 F.2d 526, 537 (5th Cir. 1988). "Unlike many other conspiratorial offenses, section 846 does not require proof of an overt act in furtherance of the conspiracy." United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989).

The evidence regarding the attempted reclamation on Sunday evening, January 8th, is also persuasive. It is highly suspicious that all five men, including a hired attorney, were needed or interested in retrieving the vehicle, a supposedly straightforward matter. We note that the parties knew that the car was already searched fruitlessly and obviously did not expect further searches. It is also interesting that Martinez, Peinado and Baralt arrived 15 minutes before closing despite their admitted anxiety. Their desire to reclaim the vehicle did not prevent them from waiting all day Sunday, lingering in the parking lot for 3 to 4 minutes despite the pending closing and when they entered the premises they did not immediately approach the counter. Perhaps they lost their composure when they saw a male, officer Sandefer who was posing as an employee, standing at the counter when Baralt had communicated

7

with a female throughout the weekend. Martinez, flashily dressed, signed for the car so he could drive it back to Miami. When they were led to the parking lot both Martinez and Peinado immediately approached the rental. Sacerio and Rubio showed up to this reunion a short time later.

The case against Sacerio and Rubio was considerably weaker than the evidence presented against Martinez. There was damaging testimony against him given by several witnesses including Baralt, who was a witness for the defense and also Martinez's own onetime attorney. Martinez took the witness stand in his defense but was simply not believed given the persuasive evidence pointing to his involvement in the cocaine conspiracy. The claim that the introduction of a transcript of Rubio's previous testimony was reversible error is rejected. If this was error it was harmless since Baralt testified to virtually the same facts.

<u>Conclusion</u>

The evidence is sufficient for a reasonable trier of fact to find beyond a reasonable doubt that Martinez voluntarily conspired with others to possess cocaine with the intent to distribute. For the reasons stated above, the conviction and sentence of appellant is in all respects

AFFIRMED.