# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 16, 2013

Lyle W. Cayce
Clerk

No. 12-50070

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

RICHARD RAMOS; RAY ANTHONY LOPEZ, also known as Raymond Anthony Lopez,

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas
U.S.D.C. 6:10-CR-297

Before DeMOSS, OWEN, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Following a four-day trial, a jury convicted Richard Ramos and Ray Anthony Lopez with conspiracy to possess with intent to distribute, and to distribute, more than five hundred grams of a substance containing methamphetamine, in violation of 21 U.S.C. § 846 and contrary to §§ 841(a)(1), and 841(b)(1)(A)(viii).  Both defendants appeal their convictions and sentences. Based on our review of the evidence and our discussion below, we AFFIRM the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-50070

judgments of conviction, VACATE the sentences and REMAND for resentencing consistent with this opinion.

I.     Factual Background and Proceedings Below

As with many drug conspiracies, the record underlying these charges is complicated and fragmented. It involves clandestine and coded telephone calls and meetings. The record reflects information gleaned by investigators through wiretap recordings and electronic surveillance of a number of individuals.[1] Preliminarily, we note that both defendants, Ramos and Lopez, are members of a street gang called Gardena 13 that operates in Gardena, CA, a city outside of Los Angeles. Lopez admitted to being a longtime member of Gardena 13, and multiple witnesses offered testimony that he is a "shot caller," i.e. a leader, in the gang. There are about 5,000 members of the gang, many of whom are involved in narcotics use or sales, as is common among street gangs in Southern California. We mention this fact as background only.

The conspiracy as alleged by the government began in the latter half of 2009, when co-defendant Rogelio Tapia (another gang member) began transporting large quantities of methamphetamine, hidden inside vehicles, from Southern California to Texas. Although Tapia joined Gardena 13 as a teenager, and had been involved in some narcotics sales then, he had moved away from California to Temple, Texas four years earlier with his family. In 2009, Tapia became aware of the opportunity to traffic methamphetamine from Southern California for resale in Texas, where the drug's value is substantially greater. Tapia set up an arrangement with a supplier ("some guy named Jesus") and a middleman who would prepare the vehicles and drugs for transport (co-defendant Albert Aquino), neither of whom are members of the Gardena 13 gang.

---

[1] The original indictment listed six other co-defendants: Rogelio Tapia, Albert Aquino, Manuel Rivera Olmos, Karina Guzman, Glenn Kapuy, and Elaine Lopez.

No. 12-50070

Tapia ultimately made 24–30 trips from California to Texas with narcotics before his arrest in January 2011.[2] He always traveled with the drugs in vehicles specially fitted with hidden compartments. On two occasions, law enforcement stopped Tapia, confiscated his vehicle, and seized large quantities of methamphetamine. Tapia was released both times. Although the bulk of his transported methamphetamine was distributed in Texas, Tapia sold some drugs to co-defendant Manuel Olmos, a Gardena 13 member who sold narcotics within the Gardena area.[3]

Meanwhile, law enforcement officials were conducting an ongoing investigation of several Gardena 13 gang members in connection with unrelated crimes, using wiretaps and visual surveillance. The investigation revealed an unfolding situation between the Gardena 13 gang and the Mexican Mafia, a separate criminal organization that wields a significant amount of power over several California prisons, as well as the street gangs in the Los Angeles area. The Mexican Mafia exerts control over smaller gangs through violence and intimidation and requires the payment of "taxes" in return for "protection." Failure to pay such taxes to the Mexican Mafia can result in being placed on a "green light" list, whereby that individual or gang is targeted for assault, up to

---

[2] Tapia testified that the methamphetamine sold for $5,000 more per pound in Texas than in Gardena. His business grew from carrying eight ounces per trip to as much as fourteen pounds. Tapia was given the drugs on credit from his supplier in Gardena, repaying the cost upon return, and splitting the profits in half with the supplier.

[3] The government made several seizures of methamphetamine from Tapia and Olmos in connection with this investigation. This included:
- 6.26 kg of methamphetamine seized from Tapia's car on March 9, 2010 in San Bernadino, CA while Tapia was in transit to Texas;
- 2.20 kg of methamphetamine seized from Tapia's car on May 10, 2010 at the Arizona/California border while Tapia was in transit to California;
- 1.13 kg of "actual" methamphetamine seized from Tapia's residence in Temple, TX on January 26, 2011; and
- 0.11 kg of methamphetamine seized from Olmos's residence in Gardena, CA on March 23, 2010.

No. 12-50070

and including murder. A green light hurts a gang or gang member's ability to engage in criminal activity without fear of interference.

In the fall of 2009, recorded phone calls among the co-defendants and other principal parties revealed that members of Gardena 13 believed a green light had been placed on the gang for failure to pay taxes to the Mexican Mafia. Lopez and another Gardena 13 member went to a meeting where the Mexican Mafia asserted the gang would be required to pay taxes going forward, as well as immediately pay a sum of back taxes. The Mexican Mafia also assessed a personal tax on Lopez for making disrespectful comments. After this meeting, recorded phone calls indicated that Lopez and other Gardena 13 members began collecting money from other members to pay these taxes in an effort to avoid a green light.

Tapia testified that he contributed money to the taxes assessed against Gardena 13.[4] He paid some taxes to Olmos, and then later met with Lopez and offered to pay the outstanding amount of the back taxes owed ($700), since he was doing well financially and expressed concern for the well-being of the gang. Tapia also testified that a green light could potentially hurt his ability to distribute narcotics in Gardena. Lopez accepted Tapia's money, although later returned some of the contribution when he collected additional tax money from other members.

Testimony adduced at trial also indicates that Ramos was heavily involved in tax collection. Co-defendant Glenn Kapuy, who was not a member of Gardena 13 but who nevertheless sold drugs alongside Olmos, including methamphetamine, testified that Ramos repeatedly exacted taxes from him, in

---

[4] Tapia testified that he did not share the proceeds of his drug trafficking with other members of Gardena 13. He described drug sales in the city of Gardena as sales by individual members of the gang and not orchestrated by the gang. Tapia testified that he did not tell Lopez about his trafficking to Texas, although he remarked that "it should have been obvious" that he was dealing in narcotics.

the form of cash or drugs. One recorded phone call with Ramos suggests that he played an important role early on in negotiating with the Mexican Mafia for a lower tax assessment. There was no evidence presented suggesting that Tapia and Ramos had any direct contact during the conspiracy.

On December 14, 2010, Ramos and Lopez were charged in a superseding indictment, along with six others, with conspiracy to possess with intent to distribute, and to distribute, at least five hundred grams of a substance containing methamphetamine. During the jury trial, the government presented several recorded phone calls, quantities of seized methamphetamine, photo documentation of Tapia's vehicle, and the testimony of three of law enforcement agents regarding their investigation of the conspiracy. Additionally, two co-defendants gave testimony: Tapia and Kapuy, both of whom had earlier pleaded guilty to the conspiracy charges. Lopez offered testimony in his defense, asserting he had no knowledge of the conspiracy and was not a voluntary participant. The jury returned a verdict of guilty for both defendants. The district court sentenced Lopez to 360 months of imprisonment and five years of supervised release. Ramos was sentenced to 480 months imprisonment and five years of supervised release. Both defendants' terms of imprisonment were at the bottom of their respective Sentencing Guidelines range.

II.     Sufficiency of the Evidence

Both Ramos and Lopez challenge their convictions on sufficiency of the evidence grounds.[5] Where a defendant objects to the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Menesses*, 962 F.2d 420, 426 (5th Cir.

---

[5] Both defendants moved for a judgment of acquittal at the end of the government's case-in-chief, as well as again before submission of the case to the jury.

1992). We view the evidence and the inferences that may be drawn in the light most favorable to the verdict. *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999). Determining the weight and credibility of the evidence is within the sole province of the jury. *United States v. Martinez*, 975 F.2d 159, 160–61 (5th Cir. 1992).

Federal law criminalizes distribution and possession with intent to distribute a "controlled substance." 21 U.S.C. § 841(a)(1). To establish a conspiracy to violate § 841(a)(1), the government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to violate narcotics laws, (2) the defendant's knowledge of the agreement, and (3) his voluntary participation in the conspiracy. *United States v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006). In this case, because the indictment alleges involvement in a conspiracy to distribute a quantity greater than 500 grams of a substance containing methamphetamine, thereby triggering punishment within the statutory range of 21 U.S.C. § 841(b)(1)(A)(viii), a fourth element applies, i.e., the drug quantity. *United States v. DeLeon*, 247 F.3d 593, 596 (5th Cir. 2001) (citing *United States v. Doggett*, 230 F.3d 160, 164–65 (5th Cir. 2000) ("If the government seeks enhanced penalties under 21 U.S.C. § 841(b)(1)(A) or (B), the [drug] quantity must be stated in the indictment and submitted to the [fact finder] for a finding of proof beyond a reasonable doubt.")).

The proof, whether direct or circumstantial, must establish beyond a reasonable doubt that a conspiracy existed between knowing partners. *United States v. Duckett*, 550 F.2d 1027, 1030 (5th Cir. 1977). The government need not prove an overt act to show participation in a conspiracy. *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). Mere presence at a crime scene or association with conspirators is not enough to prove participation in a conspiracy, but the "agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the

No. 12-50070

development and collocation of circumstances." *United States v. Lentz*, 823 F.2d 867, 868 (5th Cir. 1987); *see also United States v. Norman*, 415 F.3d 466, 471 (5th Cir. 2005).

Ramos and Lopez do not reasonably challenge the existence of a scheme to possess and distribute methamphetamine based upon the government's interception of Tapia's vehicles and drugs en route between California and Texas. Instead, Ramos and Lopez contend that the government failed to establish beyond a reasonable doubt their connections to this conspiracy involving the other co-defendants from the indictment. They maintain that they had no knowledge of the conspiracy, and that their actions, the collection of taxes for payment to the Mexican Mafia in exchange for protection, were not related to or in furtherance of Tapia's drug conspiracy. We disagree.

While the evidence connecting Ramos and Lopez to the conspiracy is largely circumstantial, it nonetheless is sufficient to support the jury's findings of guilt. A "jury may infer a conspiracy agreement from circumstantial evidence, and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed." *United States v. Robles–Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989); *see generally United States v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992) ("Because secrecy is the norm in an illicit conspiracy, the elements of the offense may be established solely by circumstantial evidence.").

Tapia's testimony was that his drug trafficking "should have been obvious" to Lopez. Recorded phone conversations introduced at trial indicate that Lopez was aware of the involvement of several gang members in the sale of narcotics within the gang's territory. At one point, surveilling officers witnessed Lopez pick up Tapia, returning from a trip to Texas, at the Los Angeles airport along with Olmos, a distributer of Tapia's drugs. Kapuy also testified that he went along with Olmos to Lopez's house to drop off a large sum of money. Lopez

collected taxes from Tapia that allowed Tapia's business to continue without interference from the Mexican Mafia. Lopez admitted knowing that Tapia was "probably" selling drugs and that the taxes were for illegitimate businesses, not a legitimate one like his taco stand.[6] He admitted that he knew the tax money was going to the Mexican Mafia and that the people giving him tax money were involved in the sale of narcotics. There was sufficient evidence for the jury to have inferred Lopez's knowledge of Tapia and Olmos's substantial narcotics distribution scheme, especially the portion taking place within the city of Gardena, even if Lopez was not fully aware of every detail and participant.

Similarly, the evidence at trial indicates that Ramos purchased, or was given, some of Tapia's methamphetamine through Kapuy as part of his tax collection efforts on more than one occasion. As Kapuy purchased his drugs from Olmos, who bought them from Tapia, the jury could reasonably conclude that Ramos was on notice of the drug distribution conspiracy, regardless of whether or not he knew from where the drugs originated. This evidence is sufficient to demonstrate Ramos's knowledge of the narcotics distribution conspiracy.[7]

The final element is whether Lopez and Ramos each voluntarily participated in the conspiracy. The defendants argue that their membership in a gang is being used to prove "guilt by association" and imputes criminal activity to them based only on this membership. We agree that proof of gang

---

[6] "I have a taco stand and I wasn't giving no money like [the taxes]."

[7] We emphasize that we do not hold, as the dissenting opinion suggests, that "if Ramos collected taxes assessed by the Mexican Mafia on illegal activities, then Ramos can be found to have known of and to have agreed to participate in each of the illegal activities that was being taxed." Dissent Op. at 16. We do not find the evidence to be attenuated to that degree. "Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy," even in the absence of contact with other conspirators. *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir.1987) (internal quotation omitted). Here Ramos was aware of the methamphetamine distribution conspiracy of Olmos and Kapuy and acted in a way to facilitate this drug trade, whether or not he knew the full extent of Tapia's activities. He is not being tied to these activities by mere "tax collection."

membership, without more, may not form the basis of a conspiracy conviction. *See United States v. Garcia*, 151 F.3d 1243, 1245–47 (9th Cir. 1998). Yet that is simply not this case. There is substantial evidence beyond gang membership that connects Lopez and Ramos to the conspiracy. They do not dispute that they organized the collection of the taxes assessed by the Mexican Mafia on Gardena 13.[8] They dispute that these actions constitute furtherance of the conspiracy.

Testimony from Tapia and the investigating officers indicate that the Mexican Mafia taxes are seen as protection money for a street gang's criminal activities. Failure to pay the taxes could result in a green light being issued against the gang, for which the constant threat of violence would interfere with the Gardena 13 gang members' ability to conduct criminal activities. Tapia's payment (indeed *over*payment, as the record demonstrates he contributed far above the amount being solicited from other Gardena 13 members) to Lopez reliably demonstrates that he sought out this protection for his own criminal activities, which included drug distribution in Gardena, as well as the large-scale trafficking to Texas. A recorded phone call indicated that Ramos had a relationship with the Mexican Mafia associates and participated in negotiating a lower amount of taxes. Lopez received calls from Gardena 13 members concerning the presence of a "new guy" in town dealing drugs, implicitly asking for his permission and implying his control over narcotics sales in Gardena 13 territory. We conclude that the record presents sufficient evidence to demonstrates that the actions taken by Lopez and Ramos, particularly the efforts to collect and pay the Mexican Mafia "protection money," were in furtherance of the conspiracy to distribute over 500 grams of methamphetamine. Accordingly, we affirm the convictions.

---

[8] In fact, at sentencing, Lopez sought to receive a lesser punishment for his acceptance of responsibility, given that he did not challenge the government's allegations regarding his tax collection efforts.

No. 12-50070

III.   Sentencing

Lopez challenges the district court's application of the leadership enhancement to his sentence. Both Ramos and Lopez challenge the quantity of drugs used in calculating their sentences. At sentencing, the defendants submitted objections to their Pre-Sentence Reports ("PSR"). We review de novo an application of the Sentencing Guidelines, but review factual findings for clear error. *United States v. Delgado-Martinez*, 564 F.3d 750, 751 (5th Cir. 2009) (citation omitted). A district court commits procedural error by selecting a sentence based on clearly erroneous facts. *United States v. Rhine*, 637 F.3d 525, 528 (5th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 46 (2007)). If procedural error is shown, the government bears the burden of proving the error was harmless in that the district court could have imposed the same sentence absent the error. *United States v. Ibarra-Luna*, 628 F.3d 712, 718 (5th Cir. 2010). Both the determination regarding a defendant's status as a leader, as well as relevant conduct, such as quantities of drugs, are findings of fact. *See United States v. Garza*, 541 F.3d 290, 292 (5th Cir. 2008) (relevant conduct); *United States v. Dadi*, 235 F.3d 945, 951 (5th Cir. 2000) (leader or organizer).

A.   Leadership Enhancement

A defendant may be subject to a four-level increase in his offense level if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 3B1.1(a). In applying the enhancement, the court considers "the exercise of decision making authority, the nature of participation in the commission of the crime, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control exercised over others." *United States v. Cantu-Ramirez*, 669 F.3d 619, 629 (5th Cir.), *cert denied*, 133 S. Ct. 247 (2012).

No. 12-50070

We disagree with the district court's application of the leadership sentencing enhancement to Lopez's offense level calculation. While the testimony adduced at trial indicates that Lopez occupied a leadership role within the ranks of Gardena 13, the record reveals that his involvement in the actual transportation and distribution of the methamphetamine was not that of a leader. *Cf. United States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007). There was no evidence that the conspiracy charged in this case was initiated or controlled by Gardena 13 in general or Lopez in particular.[9] There is insufficient evidence to establish that Lopez directed or instructed the planning or operation of the drug conspiracy. Lopez's efforts to organize the tax collection and payment to the Mexican Mafia, for purposes of protection of the drug trade in Gardena, do not amount to a leadership role in the actual conspiracy to distribute methamphetamine presented here by the government. Accordingly, we reverse the district court's application of the leadership enhancement to Lopez's sentence.

B.    Relevant Conduct

Both Ramos and Lopez object to the quantity of drugs attributed to them.[10] They argue that the amount of methamphetamine seized by the government from Tapia and Olmos was not reasonably foreseeable to them, and thus cannot be considered as relevant conduct in sentencing.

Pursuant to section 1B1.3 of the Guidelines, the base offense level for a defendant is determined by reference to a defendant's "relevant conduct." This

---

[9] In fact, testimony from Detective Cuff indicated that "the hub of [] Tapia's source of narcotics supply . . . has absolutely nothing to do [with] or is a separate organization independent of Gardena 13."

[10] *See* supra note 3. The PSRs for both Ramos and Lopez attributed the seized methamphetamine from Tapia and Olmos to both defendants, resulting in a base offense level of 38 under U.S.S.G. § 2D1.1. Both defendants submitted objections to the district court regarding these sections of their PSRs.

includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1). The Guidelines require consideration of when a co-conspirator joined the conspiracy, what drug quantities were within the scope of the conspiratorial agreement, and of those drug quantities, the quantities that were reasonably foreseeable, prospectively only, by the defendant. *United States v. Turner*, 319 F.3d 716, 724 (5th Cir. 2003). A defendant is accountable for all quantities of contraband with which he was directly involved. U.S.S.G. § 1B1.3 cmt. n. 2. Yet, "[a] conviction for conspiracy does not automatically mean that every conspirator has foreseen the total quantity of drugs involved in the entire conspiracy." *United States v. Smith*, 13 F.3d 860, 867 (5th Cir. 1994); *see also* U.S.S.G. § 1B1.3 cmt. n. 2 ("[T]he scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant.").

Sentencing facts are required to be proven by a preponderance of the evidence. *See United States v. Harper*, 448 F.3d 732, 735 (5th Cir. 2006). Lopez argues that the district court erred by not making specific findings regarding the relevant conduct, as required by our precedent. *See United States v. Wilson*, 116 F.3d 1066, 1077 (5th Cir.), *vacated in part on other grounds sub nom.*, *United States v. Brown*, 123 F.3d 213 (5th Cir. 1997) (en banc); *see also United States v. Carreon*, 11 F.3d 1125, 1236 (5th Cir. 1994) (describing these findings as "express").[11]

After listening to counsels' arguments at the sentencing hearing, the district court concluded:

---

[11] Although only Lopez addressed this argument in his brief, we also impute this basis for remand to Ramos. *Cf. Carreon*, 11 F.3d at 1231.

No. 12-50070

The Court would find that at least by a preponderance of the evidence that it was reasonably foreseeable to each of the defendants that the amounts . . . set forth in the presentence report were reasonably foreseeable to each defendant and that each defendant is properly charged with these amounts and those objections would be overruled.

We find that the district court's conclusion amounts to a simple adoption of the PSR, failing to specifically make findings as to the quantities of drugs attributable to each defendant based on whether the drugs were within the scope of the conspiracy agreement and reasonably foreseeable to Ramos and Lopez. *See, e.g., Carreon*, 11 F.3d at 1231; *see also Smith*, 13 F.3d at 867. It is not at all clear to us that all such amounts are properly charged to these defendants. Because the government makes no attempt to demonstrate such error is harmless, we vacate the defendants' sentences and remand for resentencing. *See Ibarra-Luna*, 628 F.3d at 718.

IV.    Conclusion

Based on the foregoing discussion, we AFFIRM the convictions of Lopez and Ramos. However, we VACATE the sentences of both defendants and REMAND for resentencing pursuant to this opinion.

No. 12-50070

OWEN, Circuit Judge, concurring in part and dissenting in part:

I concur in the judgment with regard to Ray Anthony Lopez, but I respectfully dissent from the disposition of Richard Ramos's appeal. Because the evidence is insufficient to support his conviction, I would reverse.

Ramos was accused of conspiring with others, including Rogelio Tapia, to distribute and to possess with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine. This conspiracy was Tapia's drug trafficking operation, which primarily concerned the trafficking of drugs from California into Texas, not the various drug trafficking activities by individual members of the Gardena 13 gang. The Gardena 13 gang had approximately 5,000 members, many of whom sold illegal drugs. Proof that Ramos collected taxes imposed by the Mexican Mafia in order to protect drug trafficking operations by members of the Gardena 13 gang is not evidence that Ramos was protecting Tapia's drug operation.

In order to convict Ramos, the Government was required to offer evidence of "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy."[1] The majority opinion does not cite any evidence that Ramos knew of the Tapia drug conspiracy or that Ramos voluntarily participated in that conspiracy. The record is likewise devoid of such evidence. The majority opinion sets forth the facts offered against Ramos in two paragraphs and a single sentence in a third that is repetitive:

> Testimony adduced at trial also indicates that Ramos was heavily involved in tax collection. Co-defendant Glenn Kapuy, who was not a member of Gardena 13 but who nevertheless sold drugs, including methamphetamine, alongside Olmos testified that Ramos repeatedly exacted taxes from him, in the form of cash or drugs.

---

[1] *United States v. Booker*, 334 F.3d 406, 409 (5th Cir. 2003) (citing *United States v. Gallardo-Trapero*, 185 F.3d 307, 316-17 (5th Cir. 1999)).

No. 12-50070

One recorded phone call with Ramos suggests that he played an important role early on in negotiating with the Mexican Mafia for a lower tax assessment. There was no evidence presented suggesting that Tapia and Ramos had any direct contact during the conspiracy.[2]

* * *

Similarly, the evidence at trial indicates that Ramos purchased, or was given, some of Tapia's methamphetamine through Kapuy as part of his tax collection efforts on more than one occasion. As Kapuy purchased his drugs from Olmos, who bought them from Tapia, the jury could reasonably conclude that Ramos was on notice of the drug distribution conspiracy, regardless of whether or not he knew from where the drugs originated. This evidence is sufficient to demonstrate Ramos's knowledge of the narcotics distribution conspiracy.[3]

* * *

A recorded phone call indicated that Ramos had a relationship with the Mexican Mafia associates and participated in negotiating a lower amount of taxes.[4]

As to the first paragraph, the majority opinion accurately recounts that there is no evidence that Ramos ever met or had contact with Tapia. The fact that Ramos collected taxes in the form of cash or drugs to be paid to the Mexican Mafia does not connect Ramos to the Tapia conspiracy, particularly in light of the fact that there was evidence that Ramos may have been the Mexican Mafia's local representative in Gardena as well as a member of the Gardena 13 gang. Similarly, the fact that Ramos negotiated a lower rate of taxes with the Mexican Mafia does not connect Ramos to the Tapia conspiracy.

The second paragraph sets forth a highly attenuated chain between Ramos and the drugs that Tapia trafficked. The majority opinion correctly observes

---

[2] *Ante* at 4-5.

[3] *Ante* at 8.

[4] *Ante* at 9.

that Kapuy sold or gave drugs to Ramos as part of Ramos's tax collection efforts for the Mexican Mafia. Although there was evidence that Kapuy purchased *some* drugs from Olmos and Tapia supplied *some* drugs to Olmos, there was no evidence that the source of the drugs that Ramos received was Tapia and not other possible sources. Nor is there any evidence that Kapuy told Ramos the sources of his drugs. Nevertheless, from this scant evidence, the majority opinion concludes that the jury was permitted to find that "Ramos was on notice of the drug distribution conspiracy, regardless of whether or not he knew from where the drugs originated."[5]

The crux of the panel majority's reasoning seems to be that if Ramos collected taxes assessed by the Mexican Mafia on illegal activities, then Ramos can be found to have known of and to have agreed to participate in each of the illegal activities that was being taxed. I cannot agree that the law of conspiracy can be stretched this far. Ramos's knowledge of drug trafficking by Kapuy and "taxing" that illegal activity  does not equate to either knowledge of or participation in *Tapia's* drug trafficking conspiracy.

The majority attempts to deflect this criticism by asserting it does "not find the evidence to be attenuated to that degree."[6] In support of this point, it cites our precedent in *United States v. Richerson*,[7] which held that "[p]arties who *knowingly* participate with *core* conspirators *to achieve a common goal* may be members of an overall conspiracy."[8] If the record reflected that (1) Ramos knew of the common goal of the Tapia conspiracy, (2) Kapuy was a core conspirator in

---

[5] *Ante* at 8.

[6] *Ante* at 8 n.7.

[7] *Ante* at 8 n.7.

[8] *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) (emphasis added) (citing *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973)).

the Tapia conspiracy, and (3) Ramos knowingly furthered the Tapia conspiracy's common goal, then I agree that *Richerson* would control this case. The record, however, does not contain such evidence. The record reflects only that Ramos knew that Kapuy was trafficking—but that is all it reflects. Ramos's mere knowledge of Kapuy's retail methamphetamine sales is not evidence of Ramos's further knowledge that Kapuy had agreed with others in the Tapia conspiracy or of Ramos's agreement to participate in the Tapia conspiracy.

The issue is best stated as whether assessing a "tax" on illegal activities—that is, obtaining money by extortion—amounts to participation in a conspiracy to commit the illegal activity that is "taxed." I submit that the Government proved extortion, but Ramos was not charged with extortion. He was charged with agreeing "to possess with intent to distribute and to distribute a controlled substance" in excess of 500 grams.

There is no question that Ramos engaged in illegal activity. But the Government did not prove that Ramos knew of *Tapia's* drug trafficking conspiracy or that Ramos agreed to participate in that conspiracy. Accordingly, I dissent.